UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JACQUELINE WALKER MIMS                                           PLAINTIFF

V.                                          CIVIL ACTION NO. 3:09cv617-DPJ-FKB

GENERAL MOTORS                                                  DEFENDANT

ORDER

This employment-discrimination case is before the Court on the motion of Defendant

General Motors ("GM") for Summary Judgment [43] pursuant to Federal Rule of Civil

Procedure 56.  Plaintiff Jacqueline Mims, proceeding *pro se*, has responded in opposition [46,

47].  The Court, having considered the memoranda and submissions of the parties, finds that

GM's Motion should be granted.

I.      **Facts and Procedural History**

Plaintiff Jacqueline Mims—an African-American—alleges that after transferring to

GM's Jackson/Brandon Service Parts Operations Plant in August 2006 or 2007,[1] her supervisors

and coworkers discriminated against her based on sex, race, and age; subjected her to a sexual

harassment and a hostile-working environment; paid her a discriminatory wage; and retaliated

against her for filing Charges of Discrimination with the Equal Employment Opportunity

Commission ("EEOC").

There is no dispute that Mims's tenure at GM's Mississippi facility was rocky and

included numerous confrontations with her supervisors—some of which required intervention

---

[1]*Compare* Am. Compl. [20] ¶ 10 *and* Def.'s Mot. Summ. J. [43] Ex. A, Mims Depo. at
18:16-21 *with* Def.'s Mem. in Support of Mot. Summ. J. [44] at 2 (SOF ¶ 2) *and* Def.'s Mot.
Summ. J. [43] Ex. E, Charge of Discrimination, May 22, 2008.

from local law enforcement.  In all, GM documents at least 14 work-rule violations culminating in its decision to terminate Mims's employment in March 2009.[2]

After administratively exhausting at least some of her race and sex charges with the EEOC, Mims commenced this action filing a *pro se* Complaint [1] on October 15, 2009.  Mims then hired an attorney and filed an Amended Complaint [20] asserting the following four counts: (1) age, race, and sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3; (2) sexual, age, and racial discrimination in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); (3) sexual harassment in violation of Title VII; and (4) retaliatory discharge.  The Amended Complaint contains many of the same factual allegations Mims included in her original Complaint, as well as some additional detail.

In November 2010, Mims's counsel withdrew, and Plaintiff thereafter filed a second Amended Complaint [33], seeking to reinstate the original Complaint while referencing the March 2009 EEOC retaliation charge.  GM consented to Mims's request and moved for summary judgment on February 18, 2011.  After the motion was fully briefed, Mims filed what the Court construes as a sur-reply [51], prompting GM's motion to strike [53].  The Court has personal and subject matter jurisdiction and is prepared to rule.

---

[2]GM's record evidence indicates an additional six violations that are marked "removed" in Plaintiff's disciplinary history, the significance of which is unclear.  Def.'s Mot. Summ. J. [43] Ex. D, Disciplinary History; *see id.* Ex. A, Mims Dep. at 110–12.

## II.     Standard of Review

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil
Procedure when evidence reveals no genuine dispute regarding any material fact and that the
moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The rule
"mandates the entry of summary judgment, after adequate time for discovery and upon motion,
against a party who fails to make a showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear the burden of proof at trial."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the
district court of the basis for its motion, and identifying those portions of [the record] which it
believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The
nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing
that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence,
factual controversies are to be resolved in favor of the nonmovant, "but only when ... both parties
have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075
(5th Cir. 1994).  When such contradictory facts exist, the court may "not make credibility
determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.
133, 150 (2000).

The non-movant is required to "submit or identify evidence in the record to show the
existence of a genuine issue of material fact as to each element of the cause[s] of action."
*Malacara v. Garber,* 353 F.3d 393, 404 (5th Cir. 2003).  The non-movant must also "articulate
the precise manner in which the submitted or identified evidence supports his or her claim."

*Smith ex rel. Estate of Smith v. United States,* 391 F.3d 621, 625 (5th Cir. 2004). Conclusory allegations, speculation, unsubstantiated assertions and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997); *Little*, 37 F.3d at 1075. This is made particularly clear by the 2010 Amendments to Rule 56(c), which state that a party asserting that a fact is "genuinely disputed" must support the assertion by "citing to particular parts of materials in the record," and reiterate that the Court need only consider materials cited, though it may consider other materials in the record. Fed. R. Civ. P. 56(c)(1) & (3).

These rules apply equally to *pro se* litigants. Although *pro se* pleadings must be viewed liberally, such plaintiffs are still required to follow Rule 56 of the Federal Rules of Civil Procedure. In particular, the Court has no discretion to consider unsupported assertions and evidentiary materials that fall short of Rule 56's requirements. *See Gordon v. Watson,* 622 F.2d 120, 123 (5th Cir. 1980); *see also McAlpine v. Porsche Cars N. Am. Inc.*, No. 09–10407, 2010 WL 6768322, at *3 (5th Cir. June 2, 2010) (noting lack of discretion). This rule limits the Court's discretion to assist an untrained litigant in two significant ways. First, the Court must limited its review to evidence that would be admissible at trial—hearsay is not admissible. *Hernandez v. Yellow Transp., Inc.*, 641 F.3d 118, 124–25 (5th Cir. 2011). Second, a *pro se* litigant may not rely on her own unsworn statements appearing in her response. *Gordon*, 622 F.2d at 123 ("Although pro se litigants are not held to the same standards of compliance with formal or technical pleading rules applied to attorneys, we have never allowed such litigants to oppose summary judgments by the use of unsworn materials.").

Finally, "[t]he court has no duty to search the record for material fact issues.  Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) (citations omitted).  Here, Mims's Response generally fails to properly cite the record.  But this rule gives the Court discretion to consider proper record evidence whether the plaintiff cites it or not.  Given Mims's *pro se* status, the Court has attempted to consider all competent evidence.  Having conducted that review, it appears that many of the assertions found in her summary-judgment response and sur-reply—if considered—are not supported by sworn affidavits or other competent summary-judgment evidence.

## III. Analysis

Two prefatory observations frame this discussion.  First, Mims believes GM subjected her to all manner of discrimination, treating her unfavorably because of her race, sex, age, and protected activity.  But no matter how heartfelt, the Fifth Circuit "has consistently held that an employee's subjective belief of discrimination alone is not sufficient to warrant judicial relief." *Bauer v. Albemarle Corp.,* 169 F.3d 962, 967 (5th Cir. 1999) (citations and quotations omitted). Instead, the employee must come forward with record evidence satisfying the specific tests addressed below.

Second, Mims's "evidence" actually disproves class-based discrimination.  For example, Mims attempts to establish sex, race, and age discrimination by showing that other similarly-situated employees were treated more favorably than her.  But those individuals include Caucasian and African-American men and women of all ages.  Claiming that others from her

protected classes were treated better undermines her argument that GM treated her less favorably for her membership in those classes. *See Powers v. Woodlands Religious Cmty. Inc*., 323 F. App'x 300, 303 (5th Cir. 2009) (affirming summary judgment of age-discrimination claim and noting that by plaintiff's "own account, [the employer] treated both younger and older employees better than her"); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (holding that plaintiff failed to create a jury question where evidence showed individuals outside protected class were treated the same as plaintiff); *Muhammad v. Day & Zimmermann NPS*, No. 2:09–cv–01670–PGS–ES, 2011 WL 3036627, at *7 (D.N.J. July 25, 2011) (finding no race-based discrimination and observing African-American plaintiff's testimony that supervisor treated other African-American employees more favorably); *Criss v. Potter*, No. 3:06-CV-0819-BF, 2008 WL 876976, at *6 (N.D. Tex. Apr. 2, 2008) (finding no race or sex discrimination where "other members of Plaintiff's protected class were treated more favorable . . .").

     A.     Race and Sex Discrimination

     Title VII race and sex-based discrimination claims follow the *McDonnell-Douglas* burden-shifting analysis. First, the plaintiff must establish a prima facie case of discrimination by showing:

> (1) [s]he is a member of a protected class, (2)[s]he was qualified for the position at issue, (3)[s]he was the subject of an adverse employment action, and (4)[s]he was treated less favorably because of h[er] membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

*Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009); *see McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

6

If the plaintiff establishes a prima facie case, an inference of discrimination is raised, and the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse-employment action. *Lee*, 574 F.3d at 259. If such a reason is demonstrated, the plaintiff must ultimately show "that the employer's explanation is merely a pretext for" discrimination. *Id.*

In this case, Mims's summary-judgment Response mentions the following categories of alleged discrimination: (1) GM selected similarly-situated Caucasian and African-American males and females for jobs she desired, primarily work on the overnight or "OVN" shift; (2) GM reprimanded and then terminated Mims for various work-rule violations when similarly-situated Caucasian men and women were not disciplined for the "same or similar conduct"; (3) Mims felt threatened because GM supervisors "were aware of the confusion and allowed this pitting worker against worker"; and (4) a coworker "snatched" a book out of her hand. The last two categories are not supported in the record and otherwise lack sufficient weight to justify more significant review. The first two categories will be considered.

1.      Alleged Discrimination in Selection for "Jobs"

A large component of Mims's case rests on her claim that GM refused to select her for volunteer work on the OVN shift and on other jobs or tasks for which she volunteered. She claims the decisions were due to her race, sex, and age (discussed later), and observes that her supervisor selected male Caucasian employees, male African-American employees, temporary Caucasian employees, and African-American females to perform the work she wanted.[3]

---

[3]The Court questions whether this claim demonstrates an adverse-employment action (*i.e.*, an ultimate employment decision) for purposes of the third prong of a prima facie test. *Hart v. Life Care Ctr. of Plano*, 243 F. App'x 816, 818 (5th Cir. 2007) (holding that denial of shift change or request for overtime is not an adverse employment action). Although the record fails to demonstrate that these decisions equate to ultimate-employment actions—like being

Several unrebutted facts stop this claim before it starts. In particular, GM offered undisputed record evidence establishing the following: (1) GM selected Caucasian and African American men and women for these tasks and shifts; (2) GM initially selected Mims for the OVN shift, but numerous problems resulted; (3) due to Mims's many issues and grievances, GM and the UAW reached a settlement in 2008 which precluded Mims from volunteering to work the OVN shift until she was retrained; (4) once retrained, Mims could volunteer, but if she was again removed from the OVN position for poor performance she would no longer be eligible for that position; (5) retraining occurred, but continued poor performance rendered Mims ineligible for OVN work; and (6) Mims continued to volunteer, despite being ineligible.

All of this raises three insurmountable impediments to Mims's ability to establish a prima facie case of race or sex discrimination. First, when eligible she was selected; once ineligible, Mims was no longer qualified for the position, negating the second element of the prima facie test. *See Green,* 411 U.S. at 802.

Second, as stated before, Mims must show that individuals outside her protected class were treated more favorably. Here, her own Response states that she lost out to other women and African-Americans. *See Powers*, 323 F. App'x at 303 (affirming summary judgment of age-discrimination claim and noting that by plaintiff's "own account, [the employer] treated both younger and older employees better than her"). Thus, many of her comparators are not outside the protected class for purposes of the fourth prong of the test.

Finally, even if individuals outside her sex and race classes were treated better, Mims offers no record evidence that they were similarly situated. As the Fifth Circuit often states,

---

hired or promoted—GM did not rely on this theory.

8

comparators must be "similarly situated" under "nearly identical circumstances." *Lee*, 574 F.3d

at 259 (citations omitted). The standard is exacting:

> Employees with different supervisors, who work for different divisions of a
> company or who were the subject of adverse employment actions too remote in
> time from that taken against the plaintiff generally will not be deemed similarly
> situated. Likewise, employees who have different work responsibilities or who
> are subjected to adverse employment action for dissimilar violations are not
> similarly situated. This is because we require that an employee who proffers a
> fellow employee as a comparator demonstrate that the employment actions at
> issue were taken "under nearly identical circumstances."  The employment
> actions being compared will be deemed to have been taken under nearly identical
> circumstances when the employees being compared held the same job or
> responsibilities, shared the same supervisor or had their employment status
> determined by the same person, and have essentially comparable violation
> histories. And, critically, the plaintiff's conduct that drew the adverse
> employment decision must have been "nearly identical" to that of the proffered
> comparator who allegedly drew dissimilar employment decisions. If the
> "difference between the plaintiff's conduct and that of those alleged to be
> similarly situated *accounts for* the difference in treatment received from the
> employer," the employees are not similarly situated for the purposes of an
> employment discrimination analysis.

*Id.* at 259–60 (citations omitted). Mims has not identified any similarly-situated individuals

sharing her history—including terms of a negotiated settlement—that were treated more

favorably. Once GM raised these arguments, Mims was required to respond and direct the Court

to "specific facts" creating a triable issue. *See Celotex Corp.*, 477 U.S. at 324. She did not.

Even assuming a prima facie case, Mims fails to rebut GM's legitimate,

nondiscriminatory justification for not selecting her for the OVN shift—that she agreed to this as

part of a settlement of her grievances and was eventually removed from eligibility because of

continued poor performance. Mims must put forward evidence rebutting each of GM's

nondiscriminatory reasons. *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 219–20 (5th Cir.

2001). Though Mims has argued that her disciplinary record was the product of discrimination,

9

as addressed next, she does not dispute the vast majority of incidents found in GM's record, and fails to establish a genuine issue of material fact as to the incidents she does address.  Thus, even if she had established a prima facie case for discrimination based on non-selection for the OVN and other jobs, her discrimination claim on this basis still fails.

2.      GM's Disciplinary Actions against Mims

Mims also contends that GM reprimanded her based on her race and sex, resulting—under its progressive-discipline system—in the termination of her employment.  She states that others were treated better under the "same or similar" circumstances.  Pl.'s Br. Resp. [47] ¶ 3.  In the work-rule violation context, "a Title VII plaintiff may establish a prima facie case by showing 'either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly.'"  *Mayberry*, 55 F.3d at 1090 (citations omitted).  As with other such tests, Mims must show the comparators "were treated differently under circumstances 'nearly identical' to" her own.  *Id.*

It is undisputed that Mims's conduct while employed at GM was governed by the "shop rules" found in the GM-UAW collective-bargaining agreement.  Under the bargained for progressive-discipline system, repeated violations resulted in escalating penalties culminating in discharge.  In its supporting memorandum, GM provides a detailed history of Mims's many disciplinary problems that led to her discharge on March 6, 2009, for violating Shop Rule 20 ("Wasting time or loitering in toilets or on any Company property during working hours.").  B. Jones Aff. ¶ 19.

Mims's Response fails to address many of the disciplinary actions cataloged in GM's submissions.  But she does contend that GM treated others more favorably.  This Order focuses

10

on the few instances Mims specifically addresses, including:  (1) returning late from break and/or using a cell phone in March 2009; (2) a November 2008 reprimand for raising her voice; (3) a reprimand in 2007 or 2008 for loitering in the break room; and (4) a reprimand for not removing personal items from her push cart.

          a.      Returning Late from Break and/or Cell Phone Use in March 2009

According to GM's unrebutted records, it terminated Mims's employment in March 2009 for loitering on the job.  Mims contends, however, that the termination was discriminatory because "similarly situated Caucasian coworkers guilty [of] my alleged conduct . . . were not even put on notice for same or similar conduct," while Mims was reprimanded and "DLO'd." Pl.'s Br. Resp. [47] ¶ 3.  Of course these statements in her memorandum are unsworn and not competent. *Gordon*, 622 F.2d at 123.  And the competent record evidence Mims attached to her summary-judgment response fails to rebut GM's evidence that she was terminated for loitering. That said, GM attached Mims's deposition testimony regarding the incident.  In it, Mims gives a confusing response when asked about the loitering charge and denies that GM charged her with violating Shop Rule 20.  Mims Dep. at 145.  Instead, she states that GM changed its original justification for terminating her employment and ultimately based the decision on her alleged use of a cell phone during working hours, something Mims denies while admitting the phone was in her hand. *Id.* at 145–147.  Mims also denies returning late from break because "two white guys" remained in the break room when she left. *Id.* at 150–51.

Mims fails to create a triable issue on these points.  First, GM's record evidence documents that it did not change the basis of the discharge to improper cell phone use.  Second, Mims offers no proof creating a genuine dispute over the allegation that she was loitering, which

is one way to make a prima facie case.  *See Mayberry*, 55 F.3d at 1090.  At most, Mims denies being late relative to the two unidentified men still in the break room, and she contends that they were not similarly disciplined (*i.e.*, suggesting they were all late). *See* Mims Dep. at 151.  Third, her summary-judgment evidence fails to support a finding that the two unidentified men were similarly situated.  Fourth, looking beyond the record evidence she provided, Mims's own deposition testimony demonstrates the failure to identifying similarly situated coworkers because all we know is that they were "white guys."[4]   Fifth, Mims cannot establish that these men were treated differently under "nearly identical circumstances" because Mims has never seen the disciplinary record of any other employee.  Mims Dep. at 75.  For these reasons, Mims fails to demonstrate that the men were "similarly situated" under the exacting standard applied in this circuit.  *See Lee*, 574 F.3d at 259–60 (explaining standard for similarly-situated employees).

In her Response, Mims does discuss disparate treatment in discipline concerning cell phone use, arguing that, though she has been reprimanded for talking on the cell phone, GM supervisor Bruce Bender has observed similarly-situated Caucasian coworkers on the cell phone but chose not to reprimand them.  Pl.'s Br. Resp. [47] ¶ 8.  Mims even produces an affidavit from her Caucasian coworker, Janet Coonce, who states that she witnessed a supervisor "observe White coworkers on a cell phone repeatedly and not discipline them but when Jackie was alleged to have been using a cell phone, she was disciplined by being placed on Disciplinary layoff."  Pl.'s Br. Resp. [47] Ex. K, Coonce Aff. ¶ 2.   The affidavit does not provide any detail concerning these coworkers or the circumstances of their cell phone use.

---

[4]In her deposition, Mims could not remember the "two white guys" names but thought one was named "Gary."  Mims Dep. at 151, 153.

12

Mims also discusses this general issue in her deposition.  And although the Court was under no duty to consider evidence Mims did not cite, it has endeavored to consider the entire record.  But again the evidence is not sufficient to prove a comparator under the Fifth Circuit's standards.  In her deposition, Mims stated that Janet Cook (Caucasian), Doug Williams and Carl Keenan (Caucasians), and Lynn King (an African-American female) were all allowed to use their cell phones on the plant floor.  Mims Dep. at 149:7–150:5.

To begin with, Mims reference to women and other African-Americans offers no proof that GM treated individuals outside Mims's protected class more favorably and actually undercuts her claim that GM discriminated against her because she is an African-American woman.  *See Powers*, 323 F. App'x at 303.  Moreover, Mims fails to provided any evidence concerning whether these employees were "similarly situated"; the circumstances of their phone use; whether these employees were "loitering" or "wasting time"; or the disciplinary history of these employees.

Even assuming Mims could establish a prima facie case as to this incident, GM met its burden of production stating that Mims violated GM's Shop Rule 20, and was discharged under GM's progressive-discipline system.  To establish pretext, Mims must put forward evidence rebutting each of the nondiscriminatory reasons proffered by GM.  *Wallace*, 271 F.3d at 219–20. Mims must show that the proffered reason is not the "real reason for the disciplinary action and discharge, but merely a pretext for discrimination."  *Thompson v. Sanderson Farms, Inc.*, No. 3:04-cv-837-BN, 2006 WL 2711497, at *6 (S.D. Miss. Sept. 21, 2006).  Mims may establish pretext by showing either that the reason articulated is false, or by presenting evidence of disparate treatment.  *Id.*  "The question is not whether an employer made an erroneous decision;

13

it is whether the decision was made with discriminatory motive." *Mayberry*, 55 F.3d at 1091.
Mims has made no such showing.  Mims has not offered sufficient evidence to create a triable
issue on pretext.

        b.      November 2008 Reprimand for Raising her Voice

Mims described one incident in November 2008, in which she was reprimanded and
placed on DLO for "allegedly raising [her] voice discussing a work related issue," when other
white coworkers Janet Cook and Doug Williams "were witnessed raising their voices repeatedly
during their same contractual discussions with (Cursing Out Supervisors) [sic] they were not
reprimanded with DLO's or put on notice."  Pl.'s Br. Resp. [47] ¶ 6.  Mims also mentions an
incident in which GM Supervisor Calvin Adams (African-American) "placed [Plaintiff] on
notice with a DLO for saying 'shut up you're not in this' when [Plaintiff] was discussing a
contractual vacation day issue with [her] then supervisor Brad McNair."  *Id.* ¶ 7.

As an initial point, the allegation would not support a sex-discrimination claim because
Mims compares herself to white women, among others.  But as before, Mims's unsworn
statements are not competent summary judgment evidence.  *Gordon*, 622 F.2d at 123.  There is
also a question whether GM disciplined Mims for these incidents such that they might count
toward the progressive discipline leading to discharge.  Mims's disciplinary history lists no
disciplinary action taken in November 2008.  *See* Def.'s Mot. Summ. J. [43], Ex. D, Disciplinary
History.  And Mims failed to mention these allegations in her 2008 or 2009 EEOC Charges.

Additionally, Mims's exhibits fail to show that this alleged incident is actionable.  First,
Mims seems to concede the violation but suggests that others committed the same violations
without retribution.  So again, the issue is whether Mims can show the others were substantially

similar.  The only record evidence regarding these events is an affidavit from Mims's coworker

Sandra Jones, which states "there were times" when Mims was sent home without pay for raising

her voice to a supervisor, when other times a Caucasian male would curse the same supervisor

and no action be taken against that individual.  Plf.'s Br. Resp. [47] Ex. F., S. Jones Aff. at 1.

But it is not clear that the affiant has personal knowledge of the incident or whether the

statements are based on inadmissible hearsay.  Fed. R. Civ. P. 56(c)(4) (requiring affidavits used

in support of or in opposition to a motion for summary judgment to be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant is

competent to testify on the matters stated); *Jackson v. Biendenharn*, No. 10-30909, 2011 WL

2447695 (5th Cir. June 20, 2011) (conclusory affidavits omitting discrete facts or details are not

competent evidence and will not create a genuine issue for trial).

Even assuming Jones had sufficient personal knowledge to offer competent evidence, and

assuming the events she recounts are the same as those in Mims's Response, Jones's affidavit is

still too vague for the Court to find a question of fact as to whether GM treated coworkers more

favorably under nearly identical circumstances.  As discussed, the standard is stiff, and the

available evidence is not sufficient for the Court to consider the factors listed in cases such as

*Lee*, 574 F.3d at 259.[5]  Finally, the Court does not know whether GM disciplined these

individuals.  Mims's conclusory assertions with respect to this incident are insufficient to survive

summary judgment.

---

[5]Mims does not cite her deposition testimony in her Response, but it does state that
employees Doug Williams, Carl Keenan and Janet Cook would "curse supervisors," and that
Williams had cursed supervisor Calvin Adams.  But again there is not enough to show that these
employees were similarly situated to Mims or that their conduct took place under nearly identical
circumstances.  *See* Mims Dep. at 73:4–76:10.

15

c.     Returning Late from Break in 2007 or 2008[6]

Another alleged incident of discriminatory discipline mentioned in Mims's Response involved one supervisor, Brad McNair, informing Mims's supervisor, Bruce Bender, that she was in the break room inappropriately, when other Caucasian male employees, including Doug Williams, were also still in the break room.  Pl.'s Br. Resp. [47] ¶ 7.  Although similar to the allegations in March 2009, Mims seems to suggest that this was a separate incident.   Mims's unsworn assertions are not competent summary-judgment evidence.  *Gordon*, 622 F.2d at 123.  Mims does, however, offer Sandra Jones's affidavit which mentions a time when Mims returned from break a few minutes late and was singled out, even though two Caucasian males were also late.  Pl.'s Br. Resp. [47] Ex. F, S. Jones Aff. at 1–2.  Once again, Mims's evidence seems to admit the violation and fails to present a sufficient record to find GM treated the comparators more favorably under nearly identical circumstances.  As before, Jones's affidavit  provides no details concerning these Caucasian males.

Looking beyond the evidence Mims presented, her deposition testimony concerning this incident is unclear and provides little detail about the circumstances of the incident or the two Caucasian males who were allegedly treated preferentially.  In fact, Mims states that these individuals were not in her division.  *See* Mims Dep. at 135:1–136:20, 165:17–166:17.  Mims fails to raise a triable issue concerning disparate-disciplinary treatment for returning late from break in 2007 or 2008.

---

[6]Mims does not specifically mention this incident in her EEOC charges.  But, the reference to "changing shoes" in the 2008 EEOC Charge appears to be part of this incident.  *See* Mims Dep. at 134:17-136:20.

d.      Personal Items in Push Cart

Finally, Mims argues in response to GM's Motion for Summary Judgment that GM supervisor Bruce Bender would require Mims to remove personal items from the bottom of her "push cart" or "pick cart," while allowing female Caucasian coworkers to place personal items in their carts.  Pl.'s Br. Resp. [47] ¶ 9.  As evidence of this discriminatory treatment, Mims cites the Employee Grievance she filed at the time.  Pl.'s Br. Resp. [47] Ex. L.  She also attaches the affidavit of Janet Coonce who claims that she witnessed Bender treating Mims "different[ly]" by "telling Jackie to remove her (personal items) lunch pale, and or purse from her push cart." Pl.'s Br. Resp. [47], Ex. K, Coonce Aff. ¶ 1.  Coonce states that she, a Caucasian female, was not told to remove her purse, lunch or personal items, nor was any other Caucasian coworker.  *Id.* Coonce states that she, Mims and other unnamed coworkers all had the same supervisor at the time.  *Id.*  GM argues that (1) a directive concerning items placed in a push cart is not an "adverse action" and (2) this incident is not mentioned in Mims's 2008 EEOC Charge or in her various Complaints.

Even if Mims was in this instance treated differently from similarly situated Caucasian coworkers, it is unclear whether this incident resulted in a disciplinary infraction, or whether Mims was merely told to remove her items.  *See* Pl.'s Br. Resp. [47] ¶ 9; *see* Def.'s Mot. Summ. J. [43] Ex. D, Disciplinary History.   In the discrimination context, "[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating."  *McCoy v. City of Shreveport,* 492 F.3d 551, 559 (5th Cir. 2007). Poor performance evaluations, reprimands, and other actions that have a "mere tangential effect on a possible future ultimate employment decision" are not actionable adverse employment

17

actions.  *Haygood v. Peters*, 51 F. App'x 930 at *1 (5th Cir. 2002) (citation omitted).  Mims has

not established a triable issue concerning this instance of alleged discrimination.

      In summary, Mims has not submitted evidence that would raise a genuine issue of

material fact concerning discriminatory treatment by GM in disciplining her.[7]

      B.      Age Discrimination

      Mims's original Complaint and her Amended Complaint include age-discrimination

claims, but she failed to include age discrimination in her 2008 or 2009 EEOC charges.  A

plaintiff suing for age discrimination must file a timely administrative charge with the EEOC as

a precondition to filing her lawsuit.  29 U.S.C.A. § 626(d) (West 2009) ("No civil action may be

commenced . . . until 60 days after a charge alleging unlawful discrimination has been filed with

the [EEOC].  Such a charge shall be filed . . . within 180 days after the alleged unlawful practice

occurred . . ."); *see Garrett v. Judson Indep. Sch. Dist.*, 299 F. App'x 337, 343 (5th Cir. 2008)

("Age discrimination is a 'separate and distinct' claim of employment discrimination, which

requires a specific administrative charge to have been filed with the EEOC." (citing *Randel v.*

*U.S. Dep't of the Navy*, 157 F.3d 392, 395 (5th Cir. 1998))).  Because Mims failed to file an

---

      [7]It is worth noting that GM presented unrebutted evidence that other coworkers outside
Mims's protected class were disciplined in 2007 and 2008.  According to Barbara L. Jones, who
held the position of Human Resources/Health & Safety Manager during Mims's employment at
the Jackson/Brandon GM Plant, four employees in Mims's work group were disciplined in 2007
– three Caucasians and one African-American.  Def.'s Mot. Summ. J. [43] Ex. B, B. Jones Aff. ¶
15.  Three of the disciplined employees were female and one was male.  *Id.*  In 2008, of the ten
employees in Mims's work group who were disciplined for infractions, five were Caucasian,
four were African-American and one was of unknown race.  *Id.* ¶ 16.  Of those disciplined, seven
were male and three were female.  *Id.  See Mayberry*, 55 F.3d at 1090 (comparing discipline of
coworkers outside protected class).  Finally, as stated, Mims admitted that she lacked access to
any other GM employee's disciplinary or grievance history, and therefore could provide no
specifics regarding how GM disciplined other employees.  Def.'s Mem. in Support of Mot.
Summ. J. [44] at 5 (SOF ¶ 18) (citing Mims Dep. at 75).

EEOC age-discrimination charge—and is now time barred from doing so—her age

discrimination claim is dismissed.[8]

                C.        Equal Pay Act Claim

Mims alleges that GM violated the Equal Pay Act, 29 U.S.C. § 206(d) (EPA), by treating

her differently because of her sex, race, and age.  To the extent the claim is based on anything

other than sex, it finds no recourse in the EPA which provides that:

> No employer having employees subject to any provisions of this section
> shall discriminate, within any establishment in which such employees are
> employed, between employees on the basis of sex by paying wages to
> employees in such establishment at a rate less than the rate at which he pays
> wages to employees of the opposite sex in such establishment for equal work
> on jobs the performance of which requires equal skill, effort, and
> responsibility, and which are performed under similar working conditions.

29 U.S.C.A. § 206(d)(1) (West 2007).

As for sex-based discrimination, Mims has the burden of establishing the following

elements of a prima facie case:  (1) that GM is subject to the EPA; (2) that she performed work

in a position requiring equal skill, effort, and responsibility under similar working conditions;

and (3) that she was paid less than the comparable male employee.  *Chance v. Rice Univ.*, 984

F.2d 151, 153 (5th Cir. 1993).

Mims appears to assert two EPA violations.  First, she contends that a "Caucasian

supervisor dock[ed] [her] pay . . . ."  Pl.'s Br. Resp. [47] ¶ 5.  Second, Mims complains in her

sur-reply that GM wrongfully withheld military-leave pay she was legally entitled to receive.

Even considering the sur-reply, neither claim survives GM's Motion because Mims falls short on

the second and third prongs of the test.

---

[8]For reasons stated in GM's memorandum, the claim would not survive anyway.

As with many of her contentions, Mims offers no competent-record evidence to establish a prima facie case. The vague and conclusory statements in her Response [47] and sur-reply [51] remain unsworn and incompetent at the summary-judgment stage. *See Gordon*, 622 F.2d at 123. But assuming, for argument's sake, that GM docketed her pay and withheld reimbursement for military leave, Mims still fails to offer competent record evidence identifying a male comparator who was paid more or treated better. Mims has not raised a triable issue of fact concerning her Equal Pay Act claim.

C.      Hostile-Work-Environment Claim

To establish a prima facie case of hostile work environment against a supervisor, a plaintiff must show that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual or racial harassment; (3) the harassment was based on her sex or race; and (4) the harassment affected a term, condition, or privilege of her employment. *Stewart v. Miss. Tansp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 354 (5th Cir. 2001); *see Arensdorf v. Geithner*, 329 F. App'x 514, 517 (5th Cir. 2009). As the Fifth Circuit articulated in *Indest v. Freeman Decorating, Inc.*:

> [S]exual harassment which does not culminate in an adverse employment decision must, to create a hostile work environment, be severe or pervasive. Incidental, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability. Discourtesy or rudeness, "offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changed in 'terms and conditions of employment.'"

164 F.3d 258, 264 (5th Cir. 1999) (citation omitted).

The Court looks to the "totality of the circumstances" when deciding whether conduct is "severe or pervasive," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it

20

unreasonably interferes with an employee's work performance."  *Stewart*, 586 F.3d at 330 (citing *Lauderdale*, 512 F.3d 157, 163 (5th Cir. 2007); *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 434 (5th Cir. 2005)).  The environment must be "objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."  *Stewart*, 586 F.3d at 330 (citation omitted); *Lauderdale*, 512 F.3d at 163.

As with the other claims, the Court has attempted to review Mims's pleadings in a broad light.  In her Response, she mentions that her supervisor Calvin Adams called her "honey, baby and sweetheart" and that he constantly harassed her by, for example, "poking pens in [her] face (personal space) and shouting orders."  Pl.'s Br. Resp. [47] at 2.  As stated before, these unsworn comments are not summary-judgment evidence.  But even assuming these statements were properly supported, the alleged conduct was neither severe nor pervasive.

Calling Mims "honey, baby and sweat heart" is not severe, and there is no dispute the conduct permanently ceased when she complained.  *See* Mims Dep. at 78. *See also Indest*, 164 F.3d at 265–67 (finding no employee liability where employee promptly complained and company promptly responded and stopped the harassment).  The description of the other alleged harassment is simply too vague to allow a reasonable jury to conclude that the conduct—even assuming there was any proof that it was based on sex—was severe or pervasive.  *See*, *e.g.*, *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872–874 (5th Cir. 1999) (holding that "mere utterance[s] of . . . epithet[s] that engender offensive feelings" spanning over a year did not qualify as severe or pervasive); *Gibson v. Potter*, 264 F. App'x 397, 398 (5th Cir. 2008) (holding that conduct of supervisor who "grabbed [plaintiff] on the buttocks" and allegedly

engaged in "series of events" including "'sex talk', asking for dates, and offering his telephone number" was not "sufficiently severe or pervasive to alter a term or condition of [plaintiff's] employment").[9]

## D.     Retaliatory Discharge

Mims's final claim alleges that GM retaliated against her for engaging in activity protected under Title VII.  But her Response [47] fails to address the claim in any way despite GM's extensive arguments on the subject.  The failure to respond constitutes abandonment.  *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (holding that "failure to pursue this claim beyond her complaint constituted abandonment").  Mims does revisit the claim in her sur-reply, but because GM raised the issue in its motion, the sur-reply—which was filed without leave of Court—cannot be viewed as proper rebuttal.  *See, e.g.*, *Tobias v. Price*, No. 3:06-cv-1361-M, 2009 WL 3681981, at *4 n.6 (N.D. Tex. Nov. 4, 2009) (striking unauthorized *pro se* sur-reply).  GM's unopposed motion to strike is therefore granted.

Even if considered, the sur-reply is in many respects defective because it relies on unsworn statements and documents that GM denies receiving in discovery.  Getting past all of that, the sur-reply would still fall short of Title VII's substantive requirements.

---

[9]Mims's Response does not directly assert racial harassment, but to the extent it can be inferred, Adams is the only supervisor Mims links to specific harassment, and he is African-American like Mims.  Harassment can exist among members of the same class.  *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79–80 (1998) (holding that sex discrimination consisting of same-sex sexual harassment is actionable).  But here, there is no evidence that Adams harassed Mims "because of" her race.  *See Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 270 (5th Cir. 1998) (affirming summary judgment of hostile-work-environment claim for lack of evidence that harassment was "because of" protected characteristic).  Finally, Mims mentions conduct of coworkers that created a hostile environment.  Pl.'s Br. Resp. [47] at 2.  But these vague and conclusory allegations are not supported and are neither severe nor pervasive.

Title VII retaliation claims follow the same burden-shifting analysis applied to race and sex-based discrimination claims. To establish a prima facie claim for retaliation, Mims must show that (1) she engaged in a protected activity, (2) GM took an adverse employment action against her, and (3) there was a causal connection between the protected activity and the adverse action. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001). If the plaintiff establishes a prima facie case, the burden then shifts to the employer to offer a legitimate, non-retaliatory reason for its actions. *Id.* "Upon answering this inquiry, the burden returns to the plaintiff to prove that the protected conduct 'was a "but for" cause of the adverse employment decision.'" *Hernandez v. Yellow Transp., Inc*., 641 F.3d 118, 129 (5th Cir. 2011) (citation omitted).

A liberal reading of the sur-reply [51] indicates two retaliatory acts—the termination and the refusal to pay military leave. There is no dispute Mims engaged in protected activity and therefore meets the first prong of the prima facie test. To satisfy the second prong, Mims must show a materially adverse employment action by demonstrating that the act would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.*" Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Title VII's anti-retaliation provision does not address "petty slights, minor annoyances, and simple lack of good manners." *Id*.

Looking at the alleged conduct, the termination was materially adverse; the leave incident was not. Mims has conceded that GM told her to submit a clean copy of her Leave and Earnings Statement so it could process the request, that she never provided one, and that she could have. Mims Dep. at 48:5–51:14. Requiring an employee to submit proper paperwork in the employee's possession would not dissuade a reasonable employee from engaging in

23

protected conduct.  *See, e.g.*, *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331–32 (5th Cir.

2009) (finding no materially adverse employment decision);  *Magiera v. City of Dallas*, 389 F.

App'x. 433, 437 (5th Cir. 2010) (finding no materially adverse employment action when

supervisor sent plaintiff home from work, and subjected employee to heightened scrutiny).

Finally, GM's alleged acts would not dissuade a reasonable person from complaining and did not

dissuade Mims who filed additional complaints after the military-pay incident.  *See DeHart v.*

*Baker Hughes Oilfield Operations, Inc*., 214 F. App'x. 437, 442 (5th Cir. 2007) (holding that

reprimand would not dissuade a reasonable employee from complaining "given that several

weeks later . . . a charge was filed").  Thus, only the termination claim reaches the final prong of

the prima facie test.

        To establish the third "causal-connection" prong of the prima facie case, "'the evidence

[must] demonstrate [] that 'the employer's decision to terminate was based in part on knowledge

of the employee's protected activity.'"  *Medina*, 238 F.3d at 684 (citation omitted).  Here, Mims

offers the conclusory observation that she complained and that she was terminated.  But the mere

fact of termination is not sufficient, and Mims presents no competent record evidence proving

causation.

        In addition, the delays between her EEOC charges and the termination belie retaliatory

motive.  GM terminated Mims's employment in March 2009, sixteen months after the first

charge and ten months after the second.  The Fifth Circuit has held that delays of this length

dispel unlawful retaliatory intent.  *Watson v. Tex. Youth Comm'n*, 269 F. App'x 498, 502 (5th

Cir. 2008) (holding that thirteen month "lapse of time is simply too remote to support an

inference of retaliation" and that "the district court did not error in concluding that Watson had

failed to establish a prima facie case of retaliation") (citations omitted); *Ameen v. Merck & Co.*,
226 F. App'x 363, 376 (5th Cir. 2007) (finding plaintiff failed to establish prima facie case and
noting that timing of plaintiff's "termination, eleven months after she allegedly complained . . .
casts significant doubt on the claim that her termination was in retaliation for that complaint")
(citations omitted); *Grizzle v. Travelers Health Network, Inc*., 14 F.3d 261, 268 (5th Cir. 1994)
("Although this lapse of time is, by itself, insufficient to prove there was no retaliation, in the
context of this case it does not support an inference of retaliation, and rather, suggests that a
retaliatory motive was highly unlikely.") (citations omitted).

As with the other claims, the Court looked beyond Mims's record evidence and examined
her deposition in which Mims claims that GM disciplined her more frequently after the EEOC
charges.  Mims Dep. at 40:9-13, 83:12-21.  But Mims offers no evidence to support these
conclusory allegations, and her unrebutted disciplinary record paints a different picture.
According to GM's records, Mims was disciplined fourteen times prior to her November 21,
2007, EEOC Charge of Discrimination compared to six violations after that time.  *See* Def.'s
Mot. Summ. J. [43] Ex. D.[10]

Finally, even if Mims could get past the prima facie stage, GM clearly articulates a
legitimate non-retaliatory reason for the termination.  Thus, to avoid summary judgment on "but
for" causation, Mims must "demonstrat[e] a conflict in substantial evidence on this ultimate
issue.'"  *Hernandez*, 641 F.3d at 132 (citation omitted).  "Evidence is 'substantial' if it is of such
quality and weight that reasonable and fair-minded men in the exercise of impartial judgment

---

[10]The same is true if one looks only at those violations not "removed"; Plaintiff has ten
such violations prior to November 21, 2007, and four after that point.  *See* Def.'s Mot. Summ. J.
[43] Ex. D.

might reach different conclusions." *Id.* (citation and internal quotation marks omitted).  Because Mims presents no such evidence, GM's motion is granted.  *Compare Medina*, 238 F.3d at 685 (plaintiff rebutted nondiscriminatory reason defendant offered for discharge—plaintiff's poor performance record—by showing that his work evaluations changed dramatically after protected activity).

## IV.    Conclusion

For the reasons stated above, GM's motion for summary judgment is granted.  A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED** this the 23rd day of September, 2011.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE